## BRUMAN *v.* YELLOW TAXICAB CO.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE GENERALLY A QUESTION OF FACT.

Contributory negligence is essentially a question of fact in all cases except where by plaintiff's own testimony or the undisputed facts the case is too plain for reasonable, fair-minded men to draw different conclusions.

2. SAME—DEFENDANT'S NEGLIGENCE TO BE CONSIDERED FOR ITS BEARING ON PLAINTIFF'S CONTRIBUTORY NEGLIGENCE — SAFETY ZONE.

Where plaintiff was struck and injured by a taxicab as she was about to board a standing street car at a regular stopping place in a safety zone, evidence that the driver

---

Excessiveness of verdicts in actions for personal injuries other than death is treated in a note in L. R. A. 1915F, 30.

of the taxicab was grossly and recklessly violating both the State law and city ordinance at the time of the accident should be considered for its bearing on the question of plaintiff's contributory negligence, although it would not excuse it.

3. SAME — CONTRIBUTORY NEGLIGENCE — PRESUMPTIONS — SAFETY ZONE.

Plaintiff had a right to presume that the passage from the curb to the open door of the street car, under the circumstances, was safe as against vehicles approaching from the rear.

4. SAME.

Plaintiff was not required, as a matter of law, to anticipate that the driver of the taxicab would recklessly drive into the safety zone and pass a standing car in violation of law, and her failure to keep a constant lookout for an approaching vehicle, under the circumstances, was not conclusively presumptive negligence.

5. SAME—EVIDENCE—WEIGHT FOR JURY.

Although plaintiff's testimony contained certain inconsistencies and even improbabilities, its weight was for the jury who had the opportunity of seeing her and hearing her story and could weigh it in the light of all attending circumstances and the fact that she was rendered unconscious by the injury and was thereafter insane for a considerable time.

6. DAMAGES—EXCESSIVE VERDICT.

In view of testimony that plaintiff's injuries were severe followed by serious and to a degree lasting results, a verdict for $7,500 cannot be said to be excessive, although at the time of the trial she was able to earn the same wages as before the accident in a different line of employment.

Error to Wayne; Webster (Arthur), J. Submitted April 28, 1922. (Docket No. 91.) Decided October 2, 1922.

Case by Josephine Bruman, an infant, by her next friend, against the Yellow Taxicab Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Monaghan, Crowley, Reilley & Kellogg,* for appellant.

*S. Homer Ferguson,* for appellee.

STEERE, J.   On September 8, 1918, one of defendant's taxicabs struck and seriously injured plaintiff, a young woman 18 years of age, as she was about to board a westerly-bound street car on Grand River avenue at a regular stopping place for receiving and discharging passengers, near 12th street.   Charging her injuries to negligence of the driver of the taxicab she brought this action against defendant and recovered a judgment for $7,500.   Defendant moved for a new trial, urging that a verdict should have been directed in its favor because the proofs showed plaintiff was guilty of contributory negligence, the verdict was contrary to the overwhelming weight of evidence, and was excessive.   This motion was denied, and under numerous assignments of error reversal is asked and argued chiefly on the grounds presented in said motion, although certain alleged prejudicial errors during the progress of the trial are also urged.

The accident occurred on Sunday at about 11:35 a. m. while plaintiff and a companion named Sophrona Hoffman were on their way to attend 12 o'clock mass at St. Leo's church, located farther out on Grand River avenue.   They went from their homes to and along its north walk some distance until near the corner of 12th street where they saw a west-bound car with a trailer about to stop and decided to take it in order to make certain of reaching the church by 12 o'clock.   The car made its usual stop at that place and they together stepped off the curb to board it. They directed their course from the curb to the rear door of the front car, plaintiff taking the lead.   When she was close to the steps of the car and about to get on board a taxicab passing from the rear swept

by the side of the car and struck plaintiff, throwing her down and dragging her some 60 or 70 feet, breaking her collar-bone and inflicting other serious injuries. Miss Hoffman saw it just in time to stop and avoid being run over, but testified that she was herself within about five feet of the street car and her wrist was bruised by the taxi which passed between her and the car. She had seen the taxi when it was about a block and a half away when they were at the curb and said of its sudden appearance at the side of the street car, "I was almost unable to move when I saw how near the taxi was to me."

All witnesses testifying upon the subject except the driver of the taxi agreed that it passed the street car while it was standing at a regular stopping place with its door open to discharge and receive passengers. The rate of speed at which it passed is variously given. The taxi driver himself estimated his speed at between 12 and 15 miles an hour. Others at 15 to 18, 15 to 25 and 25 miles an hour. The conductor on the street car said:

"After we came to a complete stop the taxi was perhaps 50 feet back of the trailer. Saw the taxi 2 or 3 seconds before we came to a full stop, about 100 or 150 feet back. I looked back to see if passengers were coming out of the back end of the trailer. Did not hear any whistle from the taxicab or any noise. * * * I have always observed speed; when I first saw the automobile I did not think it was going less than 40 miles an hour; when it passed my door it was going 25."

The motorman testified that the taxicab stopped 35 or 40 feet beyond the front of the car. The taxi driver, who gave his speed when passing the car at between 12 and 15 miles per hour, said that with the brakes in good condition he could stop within less than 10 or 12 feet when going 12 miles an hour. It is undisputed he passed a stopped car or, as he contends,

one about to stop, going in the same direction as it was.

Section 12, Ordinance 461A, of the city of Detroit, provides in part:

"When a street car has stopped or is about to stop for the purpose of taking on or discharging passengers, the driver of any vehicle which is being driven on the same street and in the same direction as such street car and which has not yet passed all doors of said street car or cars, shall bring his vehicle to a complete stop, and shall remain standing until such street car has finished loading or unloading its passengers, provided, any vehicle which at the time such cars stopped has not as yet passed the rear of said car shall stop at a point six feet from the rear of said car." * * *

Section 4817, 1 Comp. Laws 1915, provides:

"No person shall operate a motor vehicle upon a public highway at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of the highway, or so as to endanger the life and limb of any person or the safety of any property; * * * the rate of speed shall not be greater than ten miles an hour in the business portion of any such city or village, and not greater than fifteen miles an hour in all other portions thereof." * * *

At and near this stopping place were located a drug store, a police station, a cartage company, welding company and police garage. There was abundant testimony to carry the question of defendant's negligence to the jury, and under the circumstances shown these excerpts from the city ordinance and State law have also some bearing on the question of plaintiff's contributory negligence, which defendant's counsel contend is shown by her own testimony, quoting from her cross-examination as follows:

"So, if there was a taxicab within 50 feet of that car, there was not anything to stop you seeing it? (No answer.)

"*Q.* That is true, isn't it?

"*A.* I don't know, I did not see any.

"*Q.* That is true, isn't it; if there was a taxicab within 50 feet of that car, you could not help but have seen it, you could have seen it?

"*A.* Well, I suppose I could have seen it.  *  *  *

"*Q.* How far did you look?

"*A.* Well, I looked all of the block and did not see a thing."

Counsel also cite the testimony of Miss Hoffman that she saw the taxi a block and a half away, as well as that of other witnesses who saw it approaching and said there was nothing to obstruct the view in that direction, point out that it was broad daylight, plaintiff's eyesight and hearing were unimpaired and urge with citation of authorities that her own testimony coupled with the undisputed facts show her negligence as a matter of law, because if she looked she must have seen it and recklessly or blindly walked into the danger which by a conscious glance she could have seen and avoided or, intent on boarding the car, she did not look at all.

In determining whether the issue was one within the field of facts about which intelligent men might honestly differ, and for the jury to decide, it is necessary to more clearly get the situation of the parties and surrounding circumstances as plaintiff's testimony tends to show they were and appeared to her at the time. Plaintiff and her companion were going arm in arm westerly along the north side of Grand River avenue as they approached the stopping place for the car, which was in front of a drug store. When they turned to the curb opposite the rear door of the front car and released their hold of each other to step off the curb and take the car Miss Hoffman was on the side towards the approaching taxi which she then saw a block and a half away, as she testified. Plaintiff testified she "looked all the block in that direction

and did not see a thing," that there was a safety zone and marker at this stopping place, not marked off but a round iron post designating it, the street car was stopped and she saw the conductor and the door open, as she remembered it; that they started across from the curb to take the car and she went ahead but did not run and got, as she remembered it, within 3 or 4 feet of the door, and the next thing she knew or heard they were taking stitches in the back of her head on the operating table in the hospital. Miss Hoffman, who looked as they were on the curb and saw the taxi about a block and a half away, testified she had hold of plaintiff's arm as they stepped off the curb together and then let go, that plaintiff walked faster and went ahead of her and was right up to the car steps when she was hit while witness was further back towards the curb. The conductor of the car testified that place was a regular stop visibly marked by a white post with a white stripe around it where they stop, that the car was stopped and he saw plaintiff come direct off the sidewalk straight to his door and had both doors open waiting for the girls. A policeman who was a patrol of the station located near the stopping place and saw the accident, said that the car was stopped at the time and both doors were open. He first noticed the girls when they were half way between the curb and the car track, estimated the distance from the curb to the track as "possibly 12 to 15 feet," did not see the taxi before it struck plaintiff when she was about 2½ feet from and about to board the car at its rear door, but heard the "sliding of the wheels as though the brakes were applied," * * * "actually saw the impact" and estimated the taxi was going 15 to 20 miles an hour before it struck her, and he saw it continue on to where it stopped about 75 feet beyond. He then called a patrol, got the girl

out from under the taxi and took her to the hospital.

Contributory negligence is essentially a question of fact in all cases except where by plaintiff's own testimony or the undisputed facts the case is too plain for reasonable, fair-minded men to draw different conclusions. While the bare fact that defendant was guilty of negligence does not excuse the negligence of plaintiff, yet, as bearing upon the question of whether or not she was negligent in failing to see and avoid the approaching automobile, the evidence that the driver was grossly and recklessly violating both the State law and city ordinance is significant. She had a right to presume and apparently believed, as her testimony indicates, that the passage from the curb to the open door of the street car standing at a regular stopping place to discharge and receive passengers was safe for one about to take it against vehicles approaching from the rear. She was not required, as a matter of law, to anticipate that this driver approaching the standing street car from the rear at a regular stopping place would recklessly pass it in violation of law. *Winckowski* v. *Dodge,* 183 Mich. 303. She was on the street for a legitimate purpose, at a place made by law in effect a safety zone for those taking and leaving the street car. Under such circumstances the rule of reasonable vigilance on a highway did not bind her to keep a constant look-out for an approaching vehicle, under penalty that, failing to do so, her negligence must be conclusively presumed. *Schock* v. *Colling,* 175 Mich. 324. The following conclusions in *Ottaway* v. *Gutman,* 207 Mich. 393, are well in point here:

"That he looked in that direction so indifferently as not to see the car coming did not make him guilty of contributory negligence, as a matter of law, nor does the improbability of his testimony produce such a result."

In the instant case defendant's counsel are able to point out certain inconsistencies and even improbabilities in the testimony of plaintiff, but the jury had the benefit of seeing her and hearing her story, with opportunity to observe her condition and manner of testifying and weigh it from that view-point in the light of all attending circumstances, shown by other witnesses or conceded.

Opportunity to hear and observe the witness was of more significance in plaintiff's case than usual, both as bearing upon her contributory negligence and defendant's contention that the verdict was excessive, for it appears by her testimony that she was rendered unconscious when the taxi struck her and it is undisputed she was thereafter insane for a considerable time, from the effects of which it is claimed she had not fully recovered at the time of the trial, although she was then able to earn the same wages as before the accident, in a different line of employment, a fact which defendant stresses against the amount of the verdict.

As to the extent of her injuries, Miss Hoffman testified in part as follows:

"When they took her out from under the car, she seemed to be conscious but the color had all left her face. She had a big bruise on the back of her ear. The blood was trickling down her neck and on her wrist here she had another. Her clothing was in terrible condition. Part of it was torn from her body. When the car hit her she seemed to be rolling over and over all of the time. I saw her under the car. Think the car ran about 70 feet after it hit her. * * * I saw her afterwards at the receiving hospital. She was turning about and by the expression of her face could tell she was in pain. * * * Saw her at the hospital about 15 times. After she left the hospital she went back to 143 Lincoln. I took her there. Her arm was in a sling at that time. * * *

"*Q.* Now, just tell the jury what you observed in

her mental condition or physical condition after this accident.

"*A.* Well, one thing, you could not depend upon her, if she had an appointment with me she perhaps had one with several others, and she would not keep either one, she didn't remember, evidently.

"*Q.* Had she done that before the accident?

"*A.* No, sir.    *    *    *    I observed from her conversations that she was telling things she thought she was capable of doing and was not.    She said that she had studied law; that she had read every book in the library; remember of some trouble in a restaurant; very slight and just once; she would pick up little things like she saw around and about.    She took the napkin and that did not belong to her."

Dr. Gardner, who attended her at the receiving hospital where she was taken by the police patrol on September 8th, testified he found she had a fracture of the upper end of the right clavicle, the collar-bone dislocated, hole in shoulder inch and a half long, laceration on the left side of the head and behind the ear, marks on the ankle and numerous other bruises, from which pain would result, that when she left the hospital on September 26th he considered her on the way to complete recovery.    He also testified as an expert of possible results from the injuries he found, but said "It was too early at that time to predict just what her future outcome would be."

Acquaintances testify to her unbalanced mental condition after she left the hospital.    She returned in about two weeks after her release therefrom to her mother's home near North Branch where her hallucinations became so pronounced and her conduct so violent at times that her mother could not control her, and she was sent by the probate judge to the psychopathic hospital at Ann Arbor.    Dr. Barrett, the director of that institution, testified of her condition while there, in part:

"I made an examination of her at the time of her

admission and found out that she was much excited, over-active, busying herself with all sorts of useless activities. She was very talkative; had illusions of various things that she was going to do; she had wrong ideas about the place she was in and was very definitely insane. Her mind was abnormal; she remained there until December 9th when she was taken home by her mother, against the advice of the doctors at the hospital.

"*Q.* What was her mental condition when she left?

"*A.* She was very much excited, possibly a little less than when she came, but was still obviously insane. * * * This mental disorder very commonly follows fright. I did not make any physical examination of her body. * * *

"*Q.* Doctor, have you made an examination today of this girl?

"*A.* I have.

"*Q.* What did you find?

"*A.* I found that the excitement that was present at the time she was in the hospital has disappeared, that she seems to have reached a fairly normal mental state except for nervousness and apprehensiveness and fears which are rather common following severe fright, there are a number of minor abnormalities of the nerves there still. There are also physical scars of definite physical injury or operations.

"*Q.* Will you just give what those physical scars are?

"*A.* There is one large scar over the right shoulder about 2 inches across seemingly from an operation, the skin is thickened, there is a definite change in the sensibility around this scar. The fingers of this same hand, there is a disturbance of sensibility, her ability to feel keenly on the last two fingers. Apart from that I found little. * * *

"*Q.* Her mental condition today, would it be a condition to follow fright of injury such as I have mentioned under an automobile?

"*A.* Yes, and it is a condition similar to what one sees after attacks of excitement which she has.

"*Q.* Now this injury to the shoulder, the sensitiveness and so on, is that permanent?

"*A.* I think that would be permanent.

"*Q.* You think that would be permanent?

"*A.* Yes, sir.   *   *   *   I would say that this girl with her present mental condition and physical condition is able to work.   As to the usual occupation of a normal girl, I think she is distinctly limited; there are some occupations that she formerly did that she cannot do now; she is unable to do typewriting and has been clerking in a store.

"*Q.* To carry on the usual occupation of the usual and normal girl?

"*A.* I think that she is distinctly limited in that there are some occupations that she formerly did which she cannot do now.   She had to do typewriting —I think stenography—she finds that now she is unable to do that and she has been doing clerking in a store.   She recognizes there are certain things she cannot do.   I think from her mental condition she realizes that now."

At the time of her injury plaintiff was employed by the Fisher Body Company in clerical work, using a typewriter and making up reports from information furnished her.   She testified that she was unable to do such work after her injury or to use a typewriter, although she had tried and been back to the school to practice up, owing to her nervous condition and trouble with the fingers of her right hand.   She afterwards secured employment as a saleswoman in different stores and was so engaged at the time of the trial.   There was also testimony of others who spoke more freely of her mental condition than she did, that before the time of her injury she was a cheerful, healthy, normal girl and thereafter radically changed in her manner, temperament and physical appearance. At the time of the trial she stated of her physical condition that resulting from the accident:

"I have a pain in my shoulder before a storm or rain, also pain in my ankle continued up to the present time, my fingers do not pain but they do not have the feeling of the others.   I have several scars.   The largest one is on my right shoulder; I have one on my

left arm; a small one above my right eye.    There is a lump of a scar back of my ear, it aches now and then."

There was ample proof for the jury to consider showing plaintiff's injuries were severe followed by serious and to a degree lasting results.    The question of compensation was under the testimony peculiarly for and left by the court with the jury to determine, under a full and fair charge as to the elements and measure of damages if the jury reached that question. We cannot find as a conclusion of law that the damages awarded were so excessive as to demand reversal.

The judgment is affirmed.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.